Richard J. Beada, Esq., SBN 97410
E-mail: crimlaw@earthlink.net
LAW OFFICES OF RICHARD J. BEADA
100 Wilshire Boulevard
Suite 2010
Santa Monica, CA 90401

Tel: (310) 393-7536
Fax: (310) 576-1242

Attorney for Defendant
**JEOPHREY RAUL MURRIETA**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. CR 17-00120-PSG |
| Plaintiff, | ) | |
| vs. | ) | |
| JEOPHREY RAUL MURRETA | ) | <u>Sentencing Hearing:</u> |
| Defendants. | ) | Date: February 5th, 2018 |
| | ) | Time: 10:00 A.M. |
| | ) | Courtroom: 6A |

## DEFENDANT'S MEMORANDUM AND EXHIBITS IN SUPPORT OF

## POSITION AT SENTENCING

    Defendant Jeophrey Raul Murrieta, by and through counsel, hereby submits the
instant Memorandum, and exhibits, in support of his position at sentencing.


Dated: January 19, 2018

/s/ Richard Beada
Richard J. Beada, Esq.
LAW OFFICES OF RICHARD J. BEADA
Attorney for Defendant

# I.

# ARGUMENT

## Under Booker and its Progeny, a Court is Constrained only by "Reasonableness" in the Determination of an Appropriate Sentence.

When it comes to the use of the Guidelines to determine a Defendant's sentence, *Booker, Kimbrough, Gall* and their like, changed everything.

In this post-*Booker* world, a district court is bound by little more than "reasonableness" in fashioning an appropriate and legal sentence. To determine such a sentence a court should: (1) calculate the relevant Guidelines range, including any applicable departures; (2) consider the advisory Guidelines range in conjunction with any relevant § 3553(a) factors; and (3) impose a reasonable sentence. *See, United States v. Mayberry*, 540 F.3d 506 519 (6th Cir. 208); *United States v. Booker,* 543 U.S. 220 (2005).

Though the Guidelines must certainly be considered, they are, post-*Booker*, just one of among the seven § 3553(a) factors to be accounted for in arriving at an appropriate sentence. *United States v. Autery*, 555 F.3d 864. 873 (9th Cir. 2009) ("[T]he district court must consider both the seven § 3553(a) factors and the Guidelines when imposing sentence.")

Because the Guidelines are considered just one of the many factors which a court must consider, the applicable Guidelines determination shall not be given more or less weight than any other § 3553 factor. *Kimbrough v. United States* (2007) 128 S. Ct. 558, 570.

Indeed, the Guidelines are not only *not mandatory* with respect to the determination of an appropriate sentence, but they are also *not to be presumed reasonable*. *Nelson v. United States,* 129 S. Ct. 890, 891 (2009). And, when given equal footing, which the Guidelines now share with all other § 3553 considerations, the

factors justifying a sentence outside the Guidelines are no longer required to be "extraordinary." *Gall v. United States* 128 S. Ct. 587, 595 (2007).

Sentencing judges are given a wide range of discretion in the types of evidence they may consider when imposing a sentence and, essential to this consideration and to the selection of an appropriate sentence, is the "possession of the fullest information possible concerning the Defendant's life and characteristics." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).

As the Supreme Court determined in *Pepper*: "Congress could not have been clearer in directing that "[n]o limitation ... be placed on the information concerning the background, character, and conduct" of a Defendant that a district court may "receive and consider for the purpose of imposing an appropriate sentence." *id.* ad 1241. "Permitting sentencing courts to consider the widest possible breadth of information about a Defendant ensures that the punishment will suit not merely the offense but the individual Defendant." *Id.,* at 1240.

Against this backdrop, this Court must determine what a *reasonable* sentence is for this particular Defendant in this case – a young man who despite an extremely difficult and challenging childhood continues to strive to improve himself and the lives of those around him. He fulfilled his childhood dream of joining the US Army, he excelled as a soldier, married, and started a family of his own before tragedy struck again, and again. Undeterred by adversity, he has now remarried, started a new family and now lovingly embraces the additional challenges of raising an Autistic child.

## II
## Circumstances of Offense

The facts and circumstances of the offense are gleaned from a review of the Government's discovery in this matter, the Probation Department's Presentence Report

1  (PSR) prepared November 6th, 2017, the accompanying recommendation letters, and

2  the Plea Agreement of the parties.

3      On March 1, 2016 Agents met with a Confidential Informant (hereafter "CI").

4  They were directing the CI to go to the Olive Hotel on South Olive Street in Los

5  Angeles to meet with an individual named Lucero to attempt a purchase of an ounce of

6  methamphetamine (hereafter "meth"). The CI was accompanied by several Agents to

7  the location and was himself outfitted with a video recorder and live transmitter. The

8  Agents and the CI were unable to locate their intended seller. While still at the Hotel

9  they are approached by Rolando Veittia, who claimed to be able to provide the ounce

10 of meth. Veittia provided the CI a phone number to arrange for the transaction.

11     On March 8, 2016 Agents and the CI arrange to buy an ounce of meth from

12 Veittia. The deal is to occur at an Albertson's Market parking lot in Montebello,

13 California. At some point just prior to the transaction, Veittia advises the CI that he

14 cannot do the deal himself, but will send "Money" (the defendant herein), to complete

15 the transaction. The defendant arrives at the location and sells the CI one ounce of

16 meth for $280. The CI is outfitted with a video recorder and a live transmitter and

17 records the transaction.

18     On March 15, 2016 Agents and the CI again arrange to purchase meth from

19 Veittia and the defendant at the same Montebello location. This time both the

20 defendant and Veittia arrive at the location together and sell 2 ounces of meth to the CI

21 for $520. The CI is outfitted with a video recorder and a live transmitter and again

22 records the transaction.

23     On March 23, 2016 the Agents and the CI arrange for the purchase of four

24 ounces of meth from the defendant. The transaction occurs in the parking lot of a Fry's

25 Electronics store in City of Industry, California. The defendant sells the CI four ounces

26 of meth for $1000. The CI is outfitted with a video recorder and a live transmitter.

27     Finally on April 11, 2016 the Agents and the CI arrange for one last transaction

28 with defendant. Like the previous transactions, the sale takes place in a business

parking lot, this time a Best Buy Electronics store located near the Albertson's Market previously used. The CI purchases $1500 worth of meth from Defendant. Again, the CI is outfitted with a video recorder and a live transmitter.

On or about March 29, 2017 Defendant was arrested while on vacation in Honolulu, Hawaii. Shortly thereafter, Defendant was returned to the Central District of California and the instant proceedings commenced.

### III
### The Plea Agreement and the Presentence Report

The Rule 11 Plea Agreement was entered into on or about August 4, 2017. The Presentence Report (hereafter PSR) was prepared on November 6, 2017. Both the parties and Probation agree that the adjusted offense level is 32 and the total offense level is 29. The Defendants' criminal history score is two, resulting in a criminal history category of II. The resulting Guidelines range is technically 97-121 months, but because of the 10 year mandatory minimum the resulting guidelines range is actually 120-121 months.

### IV
### Extraordinary Family Circumstances

As reflected in the PSR, Defendant had a very difficult and challenging childhood. This now 27 year old Defendant was born on May 23, 1990 in Montebello, California, and was the middle child of three. When defendant was 5 years old his parents divorced. At age 12, as relations deteriorated between his now divorced parents, his father was accused of abusing his sister which resulted in Defendant and his siblings being placed in foster care. As the Defendant grew older and his parents continued to struggle emotionally and financially, Defendant struggled as well.

1  Defendant reported there were times when there wasn't enough food to eat or proper

2  clothing. At age 15 his mother threw Defendant out of the house and Defendant started

3  living on friends couches. Eventually he was able to return to his father's home.

4       In high school, Defendant struggled with alcohol and drugs. After being sent to a

5  youth academy for 6 months, Defendant got his bearings and completed high school.

6  Shortly after graduation Defendant had his first child. He found employment in the

7  family business, working for his dad's Tint Shop for several years. Defendant always

8  had a dream of joining the military, and at age 22, he realized that dream and joined the

9  U.S. Army and thrived. The attached exhibits show the broad range of his training as

10  well as his achievements. That same year defendant fathered a second child with his

11  new wife. As it turns out, defendant's second child who was born prematurely, is non-

12  verbal and has been recently diagnosed as Autistic.

13       In 2015, after just two years of marriage, Defendant's wife, who was four

14  months pregnant, was diagnosed with cancer. See the attached letter from Doctor

15  Michael Marte at the Department of the Army attached hereto as exhibit "A".

16  Defendant spent his wife's last month's caring for her at a hospice. Once defendant

17  became a single father, he was forced to elect either leaving the military or giving up

18  his child for adoption. Defendant choose to leave the military with an honorable

19  discharge in order to care for his autistic child. As can be imagined, the death of his

20  wife followed by his forced resignation from his beloved military, left Defendant

21  despondent and he again turned to drugs and alcohol to mask his pain.

22

23  //

24  //

25  //

26  //

27  //

28  //

5

# V
## Loss of Caretaking and Financial Support

Defendant is essentially the sole support for his young family. While his wife works, she earns menial wages, working only part time and now living with her own mother. Add to the burden, the family recently learning that their still non-verbal, three year old child is autistic. It is hard to imagine a greater challenge for any young family than trying to raise a non-verbal autistic child. The day to day at home caretaking obligations alone are hard enough with two parents, let alone a young single Mom. Once the child reaches school age the costs of care and education skyrocket. The long term absence of the Defendant from his wife and young family will be a uniquely extreme hardship for all of them. The sooner the Defendant can return to his family and provide for them, the sooner they'll have the caretaking, emotional and financial support they are going to desperately need.

# VI
## Aberrant Behavior

Though defendant behavior would not qualify as aberrant pursuant to 5K2.20, it is still a factor the court should consider in light of the Defendant's compelling life story. After growing up in a broken home, which resulted in he and his siblings being placed in the foster care system, defendant still managed to pull himself up, complete high school and join the US military. As defendant writes in his statement to the Court, joining the military was not some sort of last resort, but rather that "I needed to pursue my dream and I joined the military academy at age 17." (Exhibit "B")

At age twenty one Defendant joined the US army and as he tells the Court in the attached statement, (Exhibit "B") "… I finally had the feeling that I was where I belonged". Defendant goes on to explain that like many young men of his age it was

the terror attacks of September 11 that pushed him in that direction.  But despite these good intentions and Defendant's love of his country and the military, life had other plans for him. While his wife was pregnant with their now three year old son, they learned she had cancer and was terminally ill. While the army took excellent care of Defendant and his pregnant wife, see the attached letter from Dr. Michael Marte, (attached as Exhibit "B") Mrs. Murrieta succumbed to her illness. See the death certificate attached hereto as exhibit "C".

As a result of now being a single parent in the US military, Defendant was given the choice of either putting up his young son for adoption or leaving his beloved army. He choose his son. Shortly thereafter Defendant suffered his first of several misdemeanor arrests. Almost concurrently with those arrests was when the conduct that led to the instant indictment occurred.

## VII
## Military Service

Though a disfavored basis for a basis for a departure pursuant to 5H1.11, the court should consider the defendants exemplary military service in determining an appropriate sentence for defendant. This was a career dreamed of by the Defendant as a young boy. He joined a Military Academy at age 17 where he completed substantial training as evidenced by the attached Future Soldier's Certificate of Training, marked collectively as exhibit "D" and attached hereto. After coming of age and joining the Army he received further recognition as evidenced by the attached Army Commendation and Achievement Medals, marked collectively as exhibit "E", and attached hereto.

It is not hard to imagine that, but for the great tragedy that befell this young man and his family, he would still be in the military serving our great nation and not before

this court facing a decade in prison. The court should impose the mandatory minimum sentence in this matter and not one day more.

## VIII

## Though Lack of Guidance as a Youth is a Disfavored Departure it Should be Considered as a Basis for Imposing the Minimum Sentence in this Case.

The PSR has an exhaustive recitation of Defendant's childhood and the almost complete lack of parental guidance he was afforded. Worse than a lack of guidance, his parents' divorce and the resulting accusations of abuse landed the Defendant and his siblings in the massive Los Angeles County foster care system. Despite this severe hardship the Defendant continued to look out for and encourage his siblings. His brother tells the court of their time in Foster Care in the attached letter (Exhibit "F"), "During the whole process my brother showed me how not to be afraid and that only good things were going to come out of it."

While the Defendant's history of childhood abuse does not rise to the level of "extreme childhood abuse" sufficient to justify a Departure, when considered in conjunction with other factors, it would be an appropriate basis for imposing a sentence at the mandatory minimum of 120 months. Defendant has clearly suffered some great adversity, yet despite this legacy, he continues to educate himself, looks to improve himself and the world around him. He has fathered a second child and tries his best to support his family. His second wife tells the court "After what seemed like his life falling apart Jeophrey always had the biggest heart and lit up every room he walked in and believe me when I say he would do anything for his boys." (Exhibit "G")

//
//

## IX

## Other Collateral Consequences

Though the notion that there are numerous debilitating collateral consequences for a conviction such as Mr. Murrieta has suffered, is nothing novel. The concept of "civil death" or "civil disabilities" as it is sometimes called, makes it all the more difficult for ex-felons to reintegrate into society. As Professor Michelle Alexander explains in her book, The New Jim Crow (2010) at page 141.

> "Today a criminal freed from prison has scarcely more rights, and arguably less respect, than a freed slave or a black person living "free" in Mississippi at the height of Jim Crow. Those released from prison on parole can be stopped and searched by the police for any reason…and returned to prison for the most minor infractions, such as failing to attend a meeting with a parole officer… The "whites only" signs may be gone, but new signs have gone up-notices placed in job applications, rental agreements, loan applications, forms for welfare benefits, school applications and petitions for licenses, informing the general public that "felons" are not wanted here. A criminal record today authorizes precisely the forms of discrimination we supposedly left behind-discrimination in employment, housing, education, public benefits, and jury service. Those labeled criminals can even be denied the right to vote."

While such civil disabilities are problematic for any ex-felon they can be virtually devastating to a young family man such as Mr. Murrieta. His earning powers are greatly diminished, his savings and social safety net are all but gone, and his own physical and emotional health will substantially diminish from the harsh ravishes of a likely decade in a federal penitentiary. These factors also support leniency as the longer Mr. Murrieta remains incarcerated the greater their impact.

//

//

//

9

1

## X

## Conclusion

On balance, given the defendant's age and family obligations as well as all the other section 3553 factors enumerated herein, the defendant urges this court to show him leniency and impose a sentence at the mandatory minimum of 120 months.

Dated: January 19, 2018                    /s/ Richard Beada
                                           Attorney for Defendant

10